*In re* MYERS, (two cases.)

(*Supreme Court, General Term, First Department.* February 11, 1891.)

EXECUTORS AND ADMINISTRATORS—LIABILITY FOR INTEREST.

On the death of a member of a firm of stock-brokers a new firm was formed, of which one of the executors of decedent was a member. The new firm continued the business, taking all the accounts and securities of its predecessor, including those of decedent. A large amount of money was kept on deposit in a trust company at a very low rate of interest, but such deposit was only incidental to carrying on the business of the new firm. The firm charged 6 per cent. for carrying the securities of customers. The books of the new firm showed a credit to decedent's estate of about $180,000. Of this, $19,000 was in securities which yielded no income, and about $4,000 had been used to pay decedent's debts. *Held,* that the executors were liable for interest at the rate of 6 per cent. on $157,000, the amount to the credit of decedent on the books of the firm, less the items, aggregating $23,000, which yield no income, etc. Modifying 11 N. Y. Supp. 543.

On reargument. For decision on appeal, see 11 N. Y. Supp. 543.

Argued before VAN BRUNT, P. J., and DANIELS, J.

*Hoadly, Lauterbach & Johnson,* (*Edgar M. Johnson,* of counsel,) for appellants. *Foster & Thomson,* for respondent Louisa Myers. *George M. Thomson,* for respondent Matilda Myers.

DANIELS, J. Upon the proposal to settle the order directed for the disposition of the appeals in these proceedings, it was objected that the deductions mentioned in the opinion should not be made, and that this should be corrected by the order to be entered to carry the decision into effect; and the case has been re-examined, on the suggestions of the counsel for the parties, to determine the soundness of this objection. And from the evidence of the executor, John A. Rutherford, there appears to be fair ground for advancing the item of $18,720.80 to the sum of $23,401, and advancing what has been called the "J. R. Account" from $96,660.36 to the sum of $120,825.45, which will bring the personal estate to the sum of $180,920.90, exclusive of the undivided half of the seat in the stock exchange, and the additional securities, in the suspense account, amounting to $10,503, making a large advance over the inventory of the appraisers. But this balance of $180,920.90 still seems to exceed the amount upon which interest should be charged against the executors; ior it appears, further, from the evidence of the same person who is the acting executor, that he is still keeping the securities and properties representing this one-half of the J. R. account, being the sum of $120,825.45 on hand, and that the new firm is not carrying any stock or bonds for any of its customers on that account. He further added that, at the time of the decease of Mr. Myers, the testator, the firm was carrying stocks and bonds, but this J. R.

account did not. If this account carried no securities for customers in the business, at the time of the decease of the testator, and has carried none since, there seems to be reason for concluding that the new firm has derived no profits from it in its business which would justify the imposition of 6 per cent. interest on the amount of it on the executors. The figures are given in the usual manner of complicating accounts entering into legal proceedings, and it may be that they will justify a different result. But that is not at present apparent. Neither the referee by his report, nor the decrees confirming it, contain any solution of this condition of the J. R. account; for they all proceed upon the theory that the value of the undivided half of the seat in the stock exchange, the additional securities in the suspense account, amounting to $10,503, and also those held in the J. R. account, should be deducted. The referee has plainly enumerated these three items as items to be deducted; and then it has been further added: "Regarding the interest of the testator in stock exchange seat, and the securities of the J. R. account, and suspense account, above mentioned, and which securities are chiefly known as 'wild cat,' I am of opinion that, in view of the contest pending, regarding the probate of the will, and the nature of the securities, and under the circumstances disclosed by the evidence, no income has been derived from those securities, and that the executors have not been guilty of such negligence in failing to dispose of them as would render the estate or the executors liable for income on those amounts, and that the executors were entitled to use their judgment in disposing of them." And these conclusions are in evident variance with that finally following, that the executors should pay interest at the rate of 6 per cent. on the total amount of $180,000; for without the J. R. account that cannot possibly be their liability. If the J. R. account has carried no securities for the customers of the new firm, and been no otherwise employed in its business than by being carried into its books, then it is difficult to see how the executors are liable to pay the rate of 6 per cent. interest upon it. The counsel may be able to show some mode through which that rate of interest may be imposed; and, to present this opportunity, a resubmission of these appeals should be permitted, by briefs to be supplied in 10 days after notice of this decision.

### ON REARGUMENT.

#### (May 15, 1891.)

DANIELS, J. These appeals have already been considered by this court, and the result which was then believed to be warranted appears from the case as it has been reported in 11 N. Y. Supp. 543. It was then held that the amount of the estate on which the executors should pay 6 per cent. interest should be $154,458.08, instead of $160,000, adopted by the referee. The counsel for the respondents strenuously insisted, after the decision had been announced, that this reduction had arisen out of a misapprehension of the evidence; and it was then concluded to rehear and further consider the case. That has now been done, and the case has been examined again, but without discovering that this conclusion was substantially out of the way. It is true that the acting executor has sworn that the balance of $180,921.22 stood to the credit of the deceased testator's estate in the books of the new firm, and would be accounted for as his estate. But he did not testify that this sum represented so much capital or money used or employed in the newly-formed firm; and the account contained in the case, as well as his evidence, which was the proof acted upon by the referee, exhibits the fact to be that it was in part made up of securities from which it does not appear that any income whatever had been derived; and he testified directly that the $30,000 for 300 shares of the Sloss Iron & Steel Company, which were appraised at the sum of $18,000, and at that amount formed part of the $180,921.22, paid no income at all. His answer was, "There has been no income from it," and he

also answered as to the Graphic stock, in like manner entering into the appraisal at the sum of $1,000, that "we have had no income from it at all." These two items reduce the general result of the appraisement and the credits to the sum of $161,000, instead of $180,000, adopted by the referee; and it does not appear that any advantage whatever was derived from them for which the executors could be legally charged with interest. And it is very probable that other securities were equally unproductive, and for that reason presented no legal basis for the allowance or support of the interest charges made by the referee. This view is directly confirmed by the evidence given concerning what has been mentioned as the J. R. and bond accounts. As to the former, there is some confusion in the evidence, in its reference to the securities of that account, and the advantages actually derived from the account itself by the new firm, which was permitted by the executors to use the moneys of the estate. But the witness by his evidence has so far distinguished between the securities and the available capital of that account as to place the interest of the estate in it at the sum of $120,825.45 while it was credited in the appraisement at $96,600.36. As to that, the same witness testified: "We had this account. That represented money invested in a speculative account in the business. That money was used to carry the securities in the business at that time. Those were the securities that were being speculated in by every customer. Instead of borrowing that amount of money, we used that to carry these securities." He added, further, that they "were no longer carrying securities for customers in the old firm;" and "the customers were charged six per cent.; that is, somebody had to pay six per cent. for the money that was used." He also testified that "we charge customers interest on the money we have used for carrying for them,—we charge six per cent.;" and he thought all the customers to be good. This evidence, which was not otherwise qualified, but was corroborated by the witness Gould, who stated that Rutherford had that money, did justify the interest charge of 6 per cent. to the extent of this sum of $120,825.45, and so far sustains the conclusion of the referee. There was also a bond account, as it has been called in the appraisal, which the witness testified had been created prior to the decease of the testator, and which at the time of his decease exhibited a balance of $36,192.40. This originated in a loan of $33,347.83, made by him in his life-time, and returned interest at the rate of 6 per cent. This interest was received by this firm, which the executors permitted to collect and use it, and for that they were legally charged by the referee. A charge of $3,786.41 was made against the credit in the appraisal, but its propriety does not seem to be maintained by the evidence of the executor, whose testimony has been chiefly depended upon in the decision of the case by the referee; and it therefore seems to be entirely fair to charge the executors with interest on this sum of $36,192.40, for the interest added in the account to the principal loaned, and interest collected from time to time, and permitted by them to be used by the new firm. There were other loans made, but it seems probable that the money was a part of the J. R. account, and therefore not increasing the amount of money used or the interest collected by the firm; and it does not appear that there were any other sources from which interest could be or was obtained than the two which have already been mentioned. The other items consist of sureties, upon none of which was it shown that dividends were paid; and, as a large part of them were appraised at no more than a nominal value, it is altogether probable that they yielded no revenue in any form or shape. Some of the securities are stated by this witness, and also by Mr. Baring Gould, another of the executors, to have been sold, and the proceeds used to pay the debts of the testator; and the amount of these added to the $19,000, which Mr. Rutherford testified produced no income, will reduce the inventory to nearly the amount already directed as the aggregate on which 6 per cent. interest should be charged; and nearly the same result is also reached

by adding to the money in the J. R. account the loan and interest upon it of $36,192.40, which this witness testified represented cash. The results maintained by these two sources justify the conclusion that the firm received, and the executors should be charged with, 6 per cent. interest upon the aggregate sum of $157,017.85, which is an increase of $2,559.77 over the aggregate sum on which interest was directed to be computed when the decision herein was first announced. It is stated in the argument of the respondents' counsel that one of the beneficiaries in the trust created by the will is deceased. If that is the fact, then an ample fund has been discharged from the trust out of which the costs may be obtained, and there can be no necessity for the further consideration of their payment. But the decrees should be modified by directing the interest to be computed at the rate of 6 per cent. upon the sum of $157,017.85, and divided on that basis, after deducting the payments already made on account of interest under the orders of the surrogate or otherwise; and, as so modified, the decrees should be affirmed, without costs of the appeal.